Kevin D. Neal (Bar No. 011640)
Kimberly G. Allen (Bar No. 029783)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona  85016-9225
Telephone:    (602) 530-8000
Facsimile:     (602) 530-8500
kevin.neal@gknet.com
kim.allen@gknet.com

Attorneys for Plaintiffs Kathy Rupp and Cheri
Erickson

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America Ex Rel. Kathy Rupp and Cheri Erickson,<br><br>                              Plaintiffs,<br><br>v.<br><br>Lynn Tilton, Patriarch Partners, LLC, and MD Helicopters, Inc.,<br><br>                              Defendants. | No.<br><br>**QUI TAM COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY DEMAND** |

COMES NOW, qui tam plaintiffs Kathy Rupp and Cheri Erickson, on behalf of the United States and on their own behalf and state and allege as follows:

**INTRODUCTION**

1.      This is a qui tam action for civil damages and penalties brought pursuant to 31 U.S.C. § 3730(b) for a fraudulent course of conduct connected to the inflated pricing of government contracts in violation of the federal False Claims Act, 31 U.S.C. § 3729 et seq. The False Claims Act "is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert- White Co.*, 390 U.S. 228, 232 (1968). The fraudulent course of conduct alleged herein includes the intentional overpricing by MD Helicopters, Inc. ("MDHI") of certain government

4348510v1/24935-0001

1  contracts for the purchase of the AH-6i Model Helicopter, and the Light Air Support

2  Helicopter (LASH), including the concurrent inflation and misrepresentation of commercial

3  and non-commercial pricing by MDHI under the control and management of Lynn Tilton,

4  CEO of MDHI, and her private equity investment firm, Patriarch Partners, LLC.

5                                    **JURISDICTION AND VENUE**

6           2.       This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3730(a)

7  and 28 U.S.C. § 1331.   This case is not based upon the prior public disclosures of

8  allegations or transactions as defined by 31 U.S.C. § 3730(e)(4)(A).   If any such public

9  disclosures have occurred, the qui tam plaintiffs qualify as "original sources" pursuant to

10 31 U.S.C. § 3730(e)(4)(B).   The Court has personal jurisdiction over the defendants

11 because the defendants transact business in this district and certain of the acts complained

12 of occurred in this district.   Venue is proper in this district under 31 U.S.C. § 3732(a)

13 because of the certain acts complained of occurred in this district.

14                                             **PARTIES**

15          3.       *Qui Tam* Plaintiff Kathy Rupp ("Rupp") resides in Arizona and is currently the

16 Aircraft Delivery Specialist.  Kathy Rupp has been an employee of MDHI for 30 years as of June

17 4th, 2013

18          4.       *Qui Tam* Plaintiff Cherie Erickson ("Erickson") resides in Arizona and is the past

19 Export Compliance Administrator (originally), changed to Export Manager.  Cherie Erickson has

20 been employed at MDHI since May 6, 2013.

21          5.       Defendant Lynn Tilton ("Tilton") is the Chief Executive Officer of Defendants

22 Patriarch Partners, LLC, and MD Helicopters, Inc.  Tilton is believed to reside in New York,

23 Florida, New Jersey, and Arizona.

24          6.       Defendant Patriarch Partners, LLC, ("Patriarch") is a for-profit debt and equity

25 investment company incorporated in Delaware and headquartered in New York (New York

26 foreign corporation filing number 2514252).  Patriarch was founded and is owned by Tilton.  As

4348510v1/24935-0001

2

1   Patriarch's owner and CEO, Tilton controls the day to day operations. Patriarch's corporate
2   headquarters are located at 1 Broadway, 5th Floor, New York, NY 10004.

3       7.      Defendant MD Helicopters, Inc., ("MDHI") is a for-profit company incorporated
4   in Arizona (filing number 08635334).  MDHI's principal place of business is located at 4555 E.
5   McDowell Road, Mesa, Arizona.  MDHI operates a helicopter manufacturing facility at this
6   location.  Patriarch holds a controlling interest in MDHI.  As CEO of both Patriarch and MDHI,
7   Tilton has exercised day to day control over MDHI's operations at all times alleged in this
8   Complaint.

9                       **APPLICABLE STATUTES AND REGULATIONS**

10      8.      **The False Claims Act**. The False Claims Act provides, in pertinent part,
11   that any person who

12      (A) knowingly presents, or causes to be presented, a false or fraudulent claim for
13      payment or approval; [or]

14      (B) knowingly makes, uses, or causes to be made or used, a false record or
15      statement material to a false or fraudulent claim ...

16      ***

17   is liable to the United States Government [for statutory damages

18   and such penalties as are allowed by law]. 31 U.S.C. §§ 3729(a)(1)(A)-(B).

19      9.      **Contract Pricing**. The Truth in Negotiations Act provides, in pertinent part,
20   that

21          ( a) Required cost or pricing data; truth in negotiations

22              (l) The head of an agency shall require offerors [and] contractors ... to
23          make cost or pricing data available as follows:

24                  (A) An offeror for a prime contract under this chapter to be
25              entered into using procedures other than sealed-bid procedures shall
26              be required to submit cost or pricing data before the award of the

1   contract if-

2   (1) in the case of a prime contract entered into after

3   December 5, 1990, the price of the contract to the United

4   States is expected to exceed $500,000;

5   ***

6   (3) Cost or pricing data required to be submitted under paragraph

7   (1)... shall be submitted-

8   (A) in the case of a submission by a prime contractor (or an

9   offeror for a prime contract), to the contracting officer for the

10   contract (or to a designated representative of the contracting officer);

11   ***

12   (d) Submission of other information.

13   (1) Authority to require submission. When certified cost or pricing

14   data are not required to be submitted under this section for a contract ..., the

15   contracting officer shall require submission of data other than certified cost

16   or pricing data to the extent necessary to determine the reasonableness of the

17   price of the contract .... [T]he contracting officer shall require that the data

18   submitted include, at a minimum, appropriate information on the prices at

19   which the item or similar items have previously been sold that is adequate

20   for evaluating the reasonableness of the price for the procurement.

21   (Emphasis added.) 10 U.S.C. § 2306a; *See also* 41 U.S.C. § 3502 et seq.

22   10.   Pursuant to formal written policy guidelines issued by Office of the

23   Secretary of Defense, obtaining sufficient pricing data from an offeror is particularly

24   critical in situations where an item is determined to be a commercial item in accordance

25   with the section 2.101 of the Federal Acquisition Regulation ("FAR") (48 C.F.R. 2.101)

26   and the contract is being awarded on a sole source basis. DF ARS/PGI 251.402- 251.403.

4348510v1/24935-0001

1   The obligation to request and provide sales data rests with both the contracting officer and

2   the offeror. Contracting officers are specifically instructed in situations involving the

3   award of a sole source contract for a commercial item to obtain prior non-governmental

4   sales data to ensure price reasonableness and are required to request that offerors provide

5   such data. PGI215.403-3. In accordance with FAR section 15.403-3(a) (48 C.F.R. 15.403-

6   3(a», the offeror has an equal duty to provide data on the prices at which the same or

7   similar items have previously been sold, adequate for determining the reasonableness of

8   the price.

9                                    **FACTUAL BACKGROUND**

10           11.     The AH-6i is an advanced variant of the AH-6M helicopter operated by the US

11   Army Special Operations Forces.  The helicopter is intended to provide close air support for land-

12   based forces and can also serve as an attack platform for destroying enemy tanks, armored

13   vehicles and fortifications.

14           12.     The AH-6 rotorcraft program was announced by Boeing at the Association of the

15   United States Army Annual Meeting and Exposition held in October 2008.  Boeing began the

16   construction of the first AH-6i prototype at its Mesa facility in early 2009.

17           13.     On July 2, 2010, Boeing and MDHI entered in a Memorandum of Agreement to

18   jointly produce and market the AH-6i helicopter.  This agreement was signed by Carl A.

19   Schopfer, at the time Vice President of MDHI, and Cynthia Ditsworth, Procurement Agent at

20   Boeing, on July 16, 2010.

21           14.     This agreement was for the manufacture and purchase of AH-6i helicopters to

22   satisfy non-commercial, government sales for Foreign Military Sales (FMS) contracts.

23           15.     On December 1, 2010 a letter from Carl Schopfer of MDHI to Ms. Cynthia

24   Ditsworth of Boeing stated Boeing would receive constant pricing of $1,675,000.00 for the

25   purchase of AH-6i aircraft through 2013 as identified in the MOA CD06252010-10 Revision A,

26   dated September 2010.

4348510v1/24935-0001

16.     On February 23, 2011, an updated pricing request was sent to Ms. Ditsworth from Carl Schopfer indicated the initial price of airframe components for the AH-6i Light Attack Reconnaissance Helicopter Program would be $1.55 million for purchases made between month 1-18, $1.75 million for purchases made between month 19-30, and $1.90 million for purchases made between month 31-42.  This letter also asked for confirmation that "Boeing will make significant commitment (50 to 60 units) per the defined work share over the next 42 months."

17.     On March 3, 2011, Carl Schopfer sent another letter to Mr. Brent Roberts at Boeing detailing price changes.  The letter detailed the pricing as follows, purchases made between month 1-18, the price per aircraft was $1.66 million, between month 19-30 $1.88 million per aircraft, and between month 31-42, $2.04 million per aircraft.  The letter referenced Boeing's commitment per the LTRC.

18.     On April 26, 2011, another letter was sent to Boeing from MDHI, this time stating the pricing as follows, between month 1-18, $1.68million per aircraft, between month 19-30, $1.9million per aircraft, and between month 31-42, $2.07 million per aircraft.

19.     On May 12, 2011, Carl Schopfer, presumably in a response to Boeing's Randy Elliot, prepared a letter explaining the price increases.  The letter based MDHI's price increases on a contract with the US Army for the MD530F, an aircraft nearly identical to the AH-61.

20.     The Army Contract for the MD530F listed the total price per aircraft at $2,738,448, with a base price of $2,300,000.00.

21.     The Army Contract for the MD530F was for the Afghan Air Force.  This proposal was submitted to the Army on January 13, 2011.  MDHI misrepresented to the Army that its base commercial price for each of its MD 530F helicopters was $2,500,000.00.  In reality, MDHI's actual base price for the helicopters was hundreds of thousands of dollars less.

22.     On May 19, 2011, in a letter in response to an email received from Bob Wells, procurement agent at Boeing, Carl Schopfer stated "During the initial commerciality discussion,

4348510v1/24935-0001

6

1    MDHI arbitrarily deducted $220,000 from the $2.3million price to make the base price of all

2    aircraft in the commerciality pricing matrix equal to $2,080,000.00".

3        23.    The "arbitrary" system is contrary to the requirements set by FAR 15.403-3,

4    15.403(c)(2) and the Contract Pricing Reference Guide, FAR 15.404-1(a)(7).

5        24.    On October 6, 2011, MDHI and Boeing entered into a Long Term Requirements

6    Contract (LTRC) (the "Agreement"), Agreement No. MDHI11LTRC1005, for the procurement of

7    goods and services for the production support of the AH-6i Light Attack Reconnaissance

8    Helicopter Program.  MDHI as seller agreed to furnish such goods and services as may be ordered

9    by Boeing, buyer, at the prices and terms set forth in the Agreement.

10       25.    A Memorandum of Understanding (MOU) was entered into between Boeing and

11   MDHI on October 11, 2011.

12       26.    The LTRC specifically stated "In the event there is a FMS Sale of Program

13   Aircraft to the US Government (USG), SELLER (MDHI) will support BUYER (Boeing) with

14   additional supporting data including data other than cost or pricing data (such as history of sales

15   of similar items) to support the commercial items pricing and certified cost and pricing data for

16   elements of the airframe deemed non-commercial (AH-6i Unique Parts) in order to justify price

17   reasonableness to the USG."

18       27.    The LTRC also stated "SELLER (MDHI) manufactures and sells the MD530F

19   armed military version of the commercial helicopter.  It is also envisioned that such aircraft can

20   provide a complementary product mate to the Program Aircraft.  Where deemed mutually

21   beneficial, SELLER and BUYER may coordinate and develop plans for cross selling both the

22   armed MD530F and the Program Aircraft (Ah-6i) to military Customers."

23       28.    The LTRC was signed by Carl A. Schopfer, Chief Operations Officer of MDHI on

24   October 28, 2011 and Steven R. Karrasch, Director-Supplier Management, on October 18, 2011.

25       29.    A "Pricing, Quantity, and Payment Matrix" was entered into between Boeing and

26   MDHI as part of the LTRC.

4348510v1/24935-0001

7

30.     Purchases made by Boeing between November 1, 2011 and August 31, 2012 had a shipset price of $1,590,000.00.  Purchases made by Boeing between September 1, 2012 and August 31, 2013, had a shipset price of $1,695,000.00, and purchases made by Boeing between September 1, 2013 and August 31, 2014 (Period 3 Pricing) had a shipset price of $1,785,000.00

31.     In 2012 Saudi Arabia signed a deal with Boeing to obtain 36 AH-6i through the U.S. Government's FMS program.  MDHI priced each helicopter at $2,500,000, hundreds of thousands of dollars over the base price.

32.     On December 9, 2013, Brad Arbaugh, Airframe Sr. Manager sent a letter to Carl Schopfer regarding AH-6i contract modification.  Based upon Boeing's requests to discuss the price increases and MDHI's refusal to respond, Boeing asked MDHI to "submit its claim for any equitable adjustment within the time period prescribed by the terms of the Purchase Contract" and further stated "MDHI is obligated under the terms of the Purchase Contract to proceed in accordance with such direction notwithstanding any disagreement as to the price impact."

33.     Carl Schopfer sent a responsive letter on December 19, 2013 to Mr. Arbaugh, asserting that Period 3 pricing would continue to apply and that "MDHI plans to line load on February 3, 2014, provided we have an agreed-to Purchase Contract ".

34.     At a minimum there is a $100,000 difference between Period 1 pricing and Period 3 with no discernible reason as to why.

35.     In March 2011, MDHI contracted with the US Army for the potential purchase of 56 AH-6i aircrafts.  The total price for each aircraft was stated $2,738,448.00.  The base price for the aircraft was $2,300,000.00.

36.     On March 18, 2011, MDHI entered into a contract with Blue Sky Air, for the purchase of a new MD530F for the base price of $1.9 million.  On April 18, 2011, MDHI entered into a contract with Helicentro for the purchase of a new MD530F with a base price of $1.9million.  On May 20, 2011, MDHI sold a new MD500E helicopter to Fuchs Helicopter for the base price of $1.55million.

37.     The price increase for the price of components modified from the MD503F for the AH-6i was $53,912.  As acknowledged in the proposed agreement between MDHI and Boeing, the small price increase for modified component parts increased the price of the AH-6i by hundreds of thousands of dollars.

38.     The purchase contract, between Boeing and MDHI, entered into on June 24, 2012 has a total value of $38,160,000.000.

39.     On April 16, 2014, Wendi Tufts, Contracts Manager at MDHI, submitted MDHI's Request for Equitable Adjustment (REA) to Boeing.

40.     The inflated pricing structure submitted to Boeing concerns Kathy Rupps and Cherie Erickson.  MDHI has failed to present any legitimate reason for the inflated pricing between Periods 1 and Periods 3.

41.     Presumably, MDHI attributes the increase in price to the component modified parts between MD530F and the AH-6i, however, the price to modify the parts is negligible when compared to the price differential between the commercial MD530F sales and the government/non-commercial AH-6i sales.

42.     On June 10, 2014, MDHI and NSRW (Non-Standard Rotary Wing) group from Huntsville, Alabama  engaged in discussions with Robert Petterson, Andrew Pillado, Director of Business Development for MDHI, David Gustafson, Program Manager for MDHI, Roger O'Dell, Director of Program Office for MDHI, and Michael Killhem, General Counsel for MDHI.

43.     NSRW was requesting additional financial documentation from MDHI which Lynn Tilton had instructed MDHI *not* to provide

44.     Michael Killhem informed NSRW that MDHI was compliant with F.A.R. Part 12.

45.     NSRW stated MDHI must be compliant with F.A.R. Part 15 as well.

46.     Petterson and Kathy Rupp had a meeting in which Petterson informed Ms. Rupp that he found a "chart" showing overpricing of the Saudi Arabia National Guard FMS (S.A.N.G.) contract, showing overpricing by MDHI of $2.3-$2.7 million.

4348510v1/24935-0001

47.     Petterson informed Rupp that he confronted Carl Schopfer, now President of MDHI, about the overpricing.

48.     In response, Mr. Schopfer stated, "Lynn Tilton does not care, it's the government and she will charge what she wants.

49.     Petterson also informed Rupp that the system used to calculate pricing on all contracts was manipulated by MDHI's I.T. department, including Jason Ball, so as to effect overpricing on government/non-commercial contracts.

50.     As of June 10, 2014, Boeing also requested financial documentation from MDHI demonstrating compliance with F.A.R. Part 15.

51.     In the daily stand-up meeting held at MDHI on June 10, 2014 Michael Booen, Vice President of Programs stated that MDHI will not provide the financial information to Boeing per the request of Lynn Tilton.

52.     On July 9, 2014, the Defense Contract Audit Agency (DCAA) informed Wendi Tufts, Contract Manager at MDHI, that they had received a request from the Army Contracting Command Redstone to examine MDHI's June 19, 2014, firm fixed price proposal submitted in response to Solicitation No. MD14060523-002-R2.

53.     The audit by DCAA was to be performed to determine whether MDHI's proposal complied with applicable criteria FAR, DFARS and FAS in all material respects.

54.     On July 25, 2014, at the daily standup meeting, in which both Kathy Rupp and Cherie Erickson were present, Mike Booen, Vice President of Programs for MDHI, informed the meeting that Lynn Tilton received a call on July 24, 2014 at 11pm Eastern Time, that the Light Air Support Helicopter (LASH) contract received approval.  The contract was for twelve (12), 369FF model helicopters for the Afghanistan Program.

55.     In the Systems Requirements Document (SRD) prepared by NATO Air Training Command-Afghanistan, the LASH aircraft will fly with the Afghan Air Force (AAF) and provide

1    Close Air Attack (CAA) capability to support Afghanistan National Security Forces (ANSF).

2    The U.S. Government has a requirement to provide an interim CAA capability for the AAF.

3         56.    MDHI will supply the LASH aircraft to the U.S. Government to fulfill its

4    requirement.

5         57.    Per the contract, six (6) aircraft will need to be on the ground in Afghanistan by

6    February 15, 2015 and the remaining six (6) by June 15, 2015. The price per aircraft was stated

7    at $2,738.448 with an additional 48 options priced at $2,972,550 per option.

8         58.    At the same meeting, Larry Dickens, Quality Inspection Manager at MDHI, stated

9    that he "could not believe that Boeing would pay so much for a fuselage (AH-6i) when they could

10   buy a new helicopter for what MDHI was charging them."

11        59.    At the daily standup meeting held on August 5, 2014, Mike Booen announced that

12   Congressional approval for the LASH contract was pending for August 8, 2014.

13        60.    At the meeting, Petterson again spoke with Rupp concerning in his words,

14   "deceptive pricing" by MDHI regarding the LASH contract. He stated Lynn Tilton changed the

15   pricing rates on the "table chart" used for pricing LASH by increasing the prices. She sent her

16   revised chart to NSRW group in Alabama on Monday, August 4, 2014.

17        61.    The price doubled, going from $3.9 million to $7.2 million with no supporting

18   reason.

19        62.    Petterson expressed concern that Mike Killham, General Counsel for MDHI, is

20   aware of the illegalities of Lynn Tilton increasing the price for LASH.

21        63.    Due to Lynn Tilton's fraudulent behavior, on August 8, 2014, Mike Booen sent in

22   his letter of resignation.

23   **FIRST CAUSE OF ACTION FOR VIOLATION OF THE FALSE CLAIMS ACT**

24   **(31 U.S.C. §§ 3729(a)(1)(A) & (b))**

25        64.    Plaintiffs re-allege and incorporate by reference the allegations in

26   paragraphs 1 through 60.

4348510v1/24935-0001

1      65.    MDHI's Purchase Contract with Boeing and the LASH contract at inflated

2      prices and its entitlement to submit claims for payment to the United States under its price

3      inflated contracts were induced by a fraudulent course of conduct set in motion by the

4      defendants which corrupted the non-commercial/governmental agreement between

5      Boeing and MDHI. This conduct included MDHI's knowing submission of false and

6      inflated prices which were accepted by Boeing as a result of an unethical and fraudulent

7      agreement entered into under the guise that MDHI would honor Period 1 pricing.  In

8      actuality, MDHI is requiring Boeing to pay Period 3 pricing, which is at a minimum

9      $200,000 more per aircraft. Boeing has requested MDHI submit a REA, but MDHI

10     refuses to provide information detailing a legitimate reason for the substantial price

11     increase.

12     66.    The defendants' corruption of the contracting process combined with

13     MDHI's false pricing were material to the Boeing's decision to contract with MDHI for

14     the sale of AH-6i Light Attack Reconnaissance Helicopters.  The fraudulent and inflated

15     pricing gave Boeing the right to either terminate the contract between MDHI and/or to

16     readjust the pricing.

17     67.    As a result of defendants' fraudulent course of conduct, Boeing entered into

18     a contract with MDHI in the amount of $38,160,000.00 for the sale of the AH-6i aircraft

19     to non-commercial, governmental entities at inflated prices. By virtue of this course of

20     conduct, defendants MDHI, Tilton, and Patriarch have knowingly presented or caused to

21     be presented false or fraudulent claims for payment or approval to the United States in

22     violation of 31 U.S.C. § 3729(a)(1)(A) and the defendants have knowingly made, used, or

23     caused to be made or used, false records or statements to get false or fraudulent claims

24     paid or approved in violation of 31U.S.C. § 3729(a)(1)(B). The United States has incurred

25     damages as a result of the defendants' unlawful scheme in an amount to be determined at

26     trial.

4348510v1/24935-0001

12

## SECOND CAUSE OF ACTION FOR VIOLATION OF THE

## FALSE CLAIMS ACT (31 U.S.C. §§ 3729(a)(I)(c)

68.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 65.

69.     By virtue of the above-described acts, at all times relevant to this Complaint the defendants, and each of them, conspired with each other to commit violations of 31 U.SC. §§ 3729(a)(1)(A) and (B) and had actual knowledge, or acted in deliberate ignorance or reckless disregard, of the fact that their individual conduct as part of the conspiracy and the conduct of their co-conspirators would cause and did cause the submission of false claims for payment or approval to the United States and that such claims were false. Upon information and belief, the United States has incurred damages as a result of the defendants' unlawful scheme in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray that judgment be entered as followed:

A.     In an amount equal to three times the amount of damages the United States has sustained because of the defendants' false or fraudulent claims and civil penalties up to the maximum permitted by law, for the maximum qui tam percentage share allowed pursuant to 31 U.S.C. § 3730(d) and for attorney's fees, costs and reasonable expenses; and

B.     For any and all other relief to which the plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs request trial by jury.

4348510v1/24935-0001

13

1

RESPECTFULLY SUBMITTED this 22[th] day of October, 2014.

2

GALLAGHER & KENNEDY, P.A.

3

4

By: */s/ Kevin D. Neal*

5          Kevin D. Neal

6          Kimberly G. Allen

7          2575 East Camelback Road
           Phoenix, Arizona  85016-9225

8          Attorneys for Qui Tam Plaintiffs Kathy
           Rupp and Cheri Erickson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

4348510v1/24935-0001